UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| JERRY OWENS,<br><br>　　　　　　　Plaintiff,<br>　　v.<br><br>CACI INTERNATIONAL INC. et al.,<br><br>　　　　　　　Defendants. | CASE NO. 3:21-cv-05570-DGE<br><br>ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 26) |

　　　This matter comes before the Court on Defendants' motion for summary judgment. (Dkt. No. 26.) The Court has considered the pleadings filed in support of and in opposition to the motion and the remainder of the record.

　　　For the reasons set forth below, the Court GRANTS Defendants' motion.

## I.   FACTUAL AND PROCEDURAL BACKGROUND[1]

**A. Gilmore's Flight and Plaintiff's Anonymous Complaint**

CACI is an information technology company and defense contractor that provides services to various clients, including the United States Government, which is CACI's largest customer. (Dkt. No. 27-1 at 17–18.) Plaintiff's employment with CACI began in January 2016 following CACI's purchase of a business unit of Plaintiff's then employer, L3 Communications Holdings. (*Id*. at 12–13.) Plaintiff was an at-will employee. (Dkt. No. 27-7 at 16.) Plaintiff signed a form acknowledging he reviewed CACI's Standards of Ethics and Business Conduct. (*Id*. at 19–20.)

CACI has offices in the Middle East, and CACI employees are often required to travel for work. Employees of CACI travelling to Iraq are required to use military transportation for international travel. (Dkt. No. 29-1 at 2.) "Flying commercial is reserved solely for personnel ending in Kuwait due to VISA constraints." (*Id*.) [A] 'Mil Air waiver' is only used if there are no seats available on the CRC flight. This is so that [t]he person is not delayed arriving into theater." (Dkt. No. 27-6 at 8.)

In early 2018, System Administrator Paul Gilmore travelled to Iraq on a commercial flight. On April 3, 2018, Deputy Program Manager Richard Needham sent Gilmore an email asking Gilmore to provide a formal email summary concerning the Mil-Air Waiver he used to

---

[1] Plaintiff's Response contains many allegations and arguments without any citation to the record. (*See* Dkt. No. 32.) It is not the task "'of the district court[] to scour the record in search of a genuine issue of triable fact. We rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment.'" *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). Thus, although Defendants move to strike those portions of Plaintiff's Opposition that fail to cite any evidence, that motion is moot as the Court will only consider facts supported by the evidence as cited to the record by the parties.

1 travel.  (Dkt. 29-1 at 4–5.)  Needham asked Gilmore to explain how he modified the waiver and
2 who authorized him to submit the waiver "without running it through the proper chain of
3 command." (*Id*.)

4       Gilmore responded to Needham's email the same day.  (*Id*. at 3–4.)  Gilmore explained
5 he had already purchased a non-refundable ticket when he learned his waiver request was being
6 denied.  (*Id*. at 4.)  Gilmore stated he purchased his ticket as soon as he was cleared by the
7 company's medical staff to travel because his travel agent informed him the ticket price "could
8 balloon from $2500 to in between $4500 and $5500" if he waited until closer to his departure
9 date to buy a ticket.  (*Id*. at 3.)

10       Gilmore stated that at a briefing shortly before his trip, his waiver was rejected because it
11 did not include the proper language, and he understood he would be required to take a military
12 flight even though he had already purchased a commercial ticket.  (*Id*.)  Gilmore said he
13 submitted a new waiver with the proper language for proofreading, and he was informed that it
14 would take several days for approval.  (*Id*. at 4.)  Gilmore stated he was concerned the company
15 would lose money on the non-refundable ticket, and informed his supervisors he had modified
16 the waiver so he could make his scheduled flight.  (*Id*.)  Gilmore apologized for his conduct,
17 stating that his behavior was "by no means" an attempt to commit forgery, and his only intention
18 was for his updated travel memo to be proofread prior to being resubmitted.  (*Id*.)

19       Needham responded to Gilmore's email the same day, stating he recognized the "Catch
20 22" situation Gilmore was in and acknowledged Gilmore was under pressure to provide a
21 correctly worded memo before his flight.  (*Id*. at 2.)  However, Needham informed Gilmore that
22 making changes without following the correct process "was wrong even if it meant impact to
23 departure." (*Id*.)

24

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT (DKT. NO. 26) - 3

Plaintiff was not included on the emails concerning Gilmore's travel situation, which Needham forwarded Plaintiff at his request. (Dkt. No. 1-1 at 5.)

On April 12, 2018, Plaintiff submitted an anonymous complaint on the website of Convercent, a third-party administrator that manages CACI's internal complaint system.[2] (Dkt. No. 27-6 at 2–3.) Plaintiff accused Gilmore of falsifying a document so he could fly commercial and then "play[ing] it off" as an accident. (*Id*. at 2.) Plaintiff stated Gilmore "knew exactly what he was doing" and should have been investigated and his employment terminated for a "grievous breach of ethics." (*Id*.) Plaintiff criticized Needham's response to the incident, saying Needham "did little more than email [Gilmore] that he shouldn't do stuff like that." (*Id*.) Plaintiff stated Needham improperly overlooked the incident, despite the recommendation of other managers that Gilmore be terminated, because Needham was "desperate to fill slots in SWA (Southwest Asia)." (*Id*.)

Plaintiff stated Needham "may have covered up or glossed over several key points" so Gilmore's explanation would seem more plausible. (*Id*.) Plaintiff claimed Gilmore "knew full well what he was doing" and exhibited a lack of moral and ethical standards. (*Id*. at 3.) Plaintiff further claimed Gilmore was a possible security risk, arguing that his security clearance should have been suspended pending review, and stating that "[i]f he will do this for his own personal comfort what will he do for money." (*Id*.) Plaintiff argued that Gilmore was a sub-par employee who played the "Race Card" to maintain his position. (*Id*.)

Plaintiff's complaint was investigated by Human Resources Business Partner Michael Griffith and Talent Acquisition Operations Specialist Amy Pedroni. (Dkt. No. 29-2.) Griffith

---

[2] Plaintiff did not reveal himself as the source of this complaint until a conversation with Needham on June 28, 2018. (Dkt. No. 27-1 at 40–41.)

and Pedroni reviewed the emails between Needham and Gilmore and had follow up discussions with Needham, Program Manager Dave Ely, and Vice President of Workplace Relations Brian Churchey. (*Id*. at 2.) Griffith and Pedroni found Gilmore acted in the company's best interests, since had he acted otherwise, his departure would have been delayed by a week, costing the company around $5,000.00. (*Id*. at 3.) Griffith and Pedroni concluded Gilmore's conduct was "[v]alid, without nefarious intent", and recommended several measures to ensure CACI's waiver form could not be modified and to educate company personnel about proper travel procedures (*Id*.) The investigation was closed on June 18, 2018. (*Id*.)

### B. Gilmore's Complaint about Plaintiff

On June 8, 2018, Gilmore submitted an anonymous complaint about Plaintiff via the Convercent website. (Dkt. No. 29-3.) Gilmore also complained directly to management. (Dkt. No. 30 at 2–3.) Gilmore stated Plaintiff was making him and other African American employees uncomfortable by speaking to them in a patronizing manner, affecting a condescending tone, and using racial epithets. (Dkt. No. 29-3 at 2.) Gilmore said Plaintiff used Needham as an "instrument of intimidation" any time Plaintiff's leadership was questioned, and always added a racial dimension to any conversation. (*Id*.) Gilmore stated Plaintiff called him "boy" on several occasions, which he considered equivalent to calling an African American a "N*****". (*Id*.)

The first incident cited by Gilmore occurred during a telephone conversation with Plaintiff on April 13, 2018. (*Id*.) During a disagreement about whether Gilmore needed to submit a status report prior to travel, Gilmore told Plaintiff he was planning to email a third party for clarification. (*Id*.) Gilmore contends Plaintiff then cursed at him and stated "Boy just shut up and do what I say." (*Id*.) The second incident occurred during a conversation between Gilmore and Plaintiff on June 8, 2018. (*Id*.) Gilmore claims he questioned Plaintiff's directive

to hand over certain passwords to an employee Gilmore felt was not authorized for administrative access. (*Id*.) Gilmore claims that after he told Plaintiff he wanted to verify the directive with Needham, Plaintiff cursed at him again and stated "God Damn it boy you will do I as I say." (*Id*.) (*sic*).

Gilmore claimed Plaintiff's "unprofessional attitude and behavior" made the workplace a hostile environment, and provided a list of eleven other employees who had negative experiences with Plaintiff. (*Id*. at 2–3.)

Plaintiff disputed Gilmore's account, admitting to cursing during a conversation with Gilmore, but denying using the term "boy". (Dkt. No. 30 at 2.) Ms. Pedroni, who interviewed Plaintiff and Gilmore following Gilmore's complaint, stated Plaintiff came off as defensive, and she expressed doubts about his credibility. (Dkt. Nos. 27-2 at 2; 30 at 2.) Pedroni found Gilmore to be credible. (Dkt. No. 30 at 2.)

Gilmore's complaint was investigated and found to be valid. (Dkt. No. 29-4 at 2.) Plaintiff was issued a written warning and demoted from his position as Operations Lead. (Dkt. Nos. 27-7 at 2; 29-4 at 2.) Plaintiff signed the warning letter, stated he was taking full responsibility for his actions, and said he was sorry his actions caused the company to lose faith in his ability to function in his position. (Dkt. No. 27-8 at 2.)

Plaintiff underwent a performance appraisal shortly after Gilmore's complaint was resolved. (Dkt. No. 27-5.) Plaintiff's appraisal was largely positive, with Needham calling him a "very valuable" employee and finding he consistently met expectations. (*Id*. at 2.) Needham noted some of Plaintiff's actions did "not reflect very well" on him, but that those actions were not representative of who Plaintiff was as an employee. (*Id*.) Needham encouraged Plaintiff to learn from the incident, move past it, and continue to perform well. (*Id*.) Plaintiff stated he

disagreed with the outcome of his encounter with Gilmore, but said he was moving on from the experience and sought to be a productive team member.  (*Id*.)

### C.  Sturgis' Complaint about Plaintiff

On May 15, 2019, CACI employee Trevecca Sturgis submitted an anonymous online complaint about Plaintiff.  (Dkt. No. 29-5 at 2.)  Sturgis claimed Plaintiff made "multiple comments" about minority employees during a meeting, and while expressing frustration about African American government employee Marcus Allen stated "Someone needs to noose [Allen] in."  (*Id*.)  Plaintiff denied making this comment.  (Dkt. No. 27-1 at 55–56.)

Griffith investigated Sturgis' complaint, interviewing Plaintiff, Sturgis, Needham, and several other individuals.  (Dkt. No. 29-6 at 2.)  In a report dated May 15, 20219, Griffith found Sturgis' complaint valid, and considering Gilmore's previous complaint, stated Plaintiff's conduct indicated a "pattern of racial insensitivity."  (*Id*. at 3.)  Griffith noted to Churchey that Sturgis was not involved in prior complaints against Plaintiff and had no apparent motivation to lie.  (Dkt. No. 31 at 2.)  Griffith recommended terminating Plaintiff's employment.  (Dkt. No. 29-6 at 3.)

On May 16, 2019, Marcus Allen sent an email in which he revealed that he had been made aware of Plaintiff's alleged comments about him.  (Dkt. No. 28-1 at 7–8.)  Allen stated he regarded the "noose" comment as a threat on his life and would do what was necessary to protect himself and his family.  (*Id*. at 8.)  Allen said this was the third incident involving Plaintiff of which he was aware, citing Gilmore's complaint and an incident he observed in which Plaintiff yelled at another person during a telephone call.  (*Id*.)

In an email dated May 21, 2019, Program Manager Ely expressed ambivalence about terminating Plaintiff's employment.  (Dkt. No. 28-1 at 13.)  Ely stated there was a "difference of

opinion" concerning whether Plaintiff made the "noose" comment at the meeting. (*Id*.) Ely noted one witness present at the meeting was unsure if Plaintiff made the comment, while two other witnesses said he did not. (*Id*.) Ely noted the previous incident involving Plaintiff and concluded there was no reason to believe Sturgis would fabricate the complaint. (*Id*.) Ely stated terminating Plaintiff's employment was a "difficult decision" due to the ambiguity surrounding the incident, but that it was not "tenable" to continue Plaintiff's employment given how "furious" Mr. Allen was about the comment and the likelihood that the government would ultimately insist on Plaintiff's removal. (*Id*.) Plaintiff was terminated on May 21, 2019. (Dkt. No. 29-7 at 2.)

### D. Plaintiff's Complaint in this Court

On July 19, 2021, Plaintiff filed a complaint in the Pierce County Superior Court against CACI and its subsidiaries, alleging he was wrongfully terminated in violation of public policy. (Dkt. No. 1-1.) Plaintiff argues he raised good faith concerns of interest to public policy by questioning CACI's decision to "cover up" Gilmore's transgression rather than fire him. (*Id*. at 12.) Plaintiff contends CACI's decision to pay for Gilmore's commercial air travel violated company policy and was a waste of state resources. (*Id*.) On August 9, 2021, Defendants removed this case to federal court. (Dkt. No. 1.)

On April 11, 2023, Defendants filed a motion for summary judgment. (Dkt. No. 26.) Defendants argue Plaintiff has failed to establish a prima facie case of wrongful termination in violation of public policy. (*Id*.) Plaintiff responded to Defendants' motion (Dkt. No. 32) and Defendant replied. (Dkt. No. 33.)

## II. LEGAL STANDARD

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party may meet this burden by showing the non-moving party has failed to provide evidence in support of their case.  *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000).  In determining whether a genuine dispute of material fact exists, "[t]he deciding court must view the evidence, including all reasonable inferences, in favor of the non-moving party."  *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017).  Disputed facts "that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," but irrelevant or inconsequential disputes will not preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III. DISCUSSION

### A. Wrongful Termination in Violation of Public Policy

In Washington, "[a]n employer may discharge an at-will employee for 'no cause, good cause or even cause morally wrong without fear of liability.'" *Roe v. TeleTech Customer Care Mgmt. (Colo.) LLC*, 257 P.3d 586, 594–595 (Wash. 2011) (quoting *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1085 (Wash. 1984)).  However, a narrow exception to the at-will employment doctrine prohibits an employer from terminating an employee "for reasons that contravene a clear mandate of public policy." *Martin v. Gonzaga Univ.*, 425 P.3d 837, 842–843 (Wash. 2018) (quoting *Thompson*, 685 P.2d at 1089).

The tort for wrongful discharge in violation of public policy has generally been limited to four scenarios: "(1) where employees are fired for refusing to commit an illegal act; (2) where employees are fired for performing a public duty or obligation, such as serving jury duty; (3)

where employees are fired for exercising a legal right or privilege, such as filing workers' compensation claims; and (4) where employees are fired in retaliation for reporting employer misconduct, i.e., whistle-blowing." *Gardner v. Loomis Armored, Inc.*, 913 P.2d 377, 379 (Wash. 1996) (citing *Dicomes v. State,* 782 P.2d 1002, 1006–1007 (Wash. 1989)).

If an employee's public policy tort action falls into one of the four *Dicomes* categories, the employee establishes a prima facie case of wrongful discharge in violation of public policy by showing: 1) that the discharge may have been motivated by reasons that contravene a clear mandate of public policy; and 2) that the public policy linked conduct was a "significant factor" in the decision to discharge the worker. *Martin,* 425 P.3d at 725–726 (internal citations omitted). If the employee succeeds in presenting a prima facie case, the burden then shifts to the employer to "articulate a legitimate nonpretextual nonretaliatory reason for the discharge." *Id*. If the employer articulates such a reason, the burden shifts back to the plaintiff either to show that the reason is pretextual, or by showing that although the employer's stated reason is legitimate, the public policy linked conduct was nevertheless a substantial factor motivating the employer to discharge the worker. *Id*. at 726.

When the employee's case does not fit neatly within one of these scenarios, a court applies a four-part framework articulated in a 1991 treatise written by Henry H. Perritt, Jr. *Mackey v. Home Depot USA, Inc.*, 459 P.3d 371, 385, n. 4 (Wash. Ct. App. 2020). Under the four-part Perritt test, a plaintiff must prove: (1) the existence of a clear public policy (the clarity element); (2) that discouraging the conduct in which they engaged would jeopardize the public policy (the jeopardy element); (3) that the public policy linked conduct caused the dismissal (the causation element); and (4) defendant must not be able to offer an overriding justification for the

dismissal (the absence of justification element). *Martin,* 425 P.3d at 723 (quoting *Gardner*, 913 P.2d at 382.

The Perritt framework should not be applied to a claim that falls within one of the four *Dicomes* scenarios of wrongful discharge in violation of a public policy. *Martin,* 425 P.3d at 723–724.

**B. The *Dicomes* Scenarios**

Plaintiff contends he raised good faith public policy concerns by questioning CACI's decision to "cover up" Gilmore's transgressions and allow the U.S. Government to pay for Gilmore's commercial travel. (Dkt. No. 1-1 at 12.) Plaintiff contends that in doing so, CACI violated its own company policies and wasted public resources. (*Id.*)

Plaintiff does not allege he was terminated under any of the *Dicomes* scenarios, and instead focuses his analysis on the four-part Perritt framework. (*See generally* Dkt. Nos. 1-1; 32.) Accordingly, this Order focuses only on the Perritt framework.

For the reasons discussed below, *infra* Section III.C., Plaintiff does not establish his claim under the Perritt framework.

**C. The Perritt Framework**

1. The Clarity Element

Under the first part of the Perritt test, Plaintiff must establish the existence of a clear public policy Defendants violated by discharging him. This element "can be established by prior judicial decisions or constitutional, statutory, or regulatory provisions or schemes." *Martin*, 425 P.3d at 725. However, courts should proceed cautiously if called upon to declare public policy absent some prior legislative or judicial expression on the subject. *Dicomes,* 782 P.2d at 1006.

Plaintiff admits the public policy he asserts, "waste of state resources", is not clearly stated in any statute or regulation. (Dkt. No. 27-9 at 3–4.) Plaintiff further acknowledges this alleged public policy is not stated in any judicial decision. Instead, he contends the Washington Supreme Court has affirmed the protections afforded employees for "raising concerns that are of interest to public policy." (*Id*. at 4; *see also* Dkt. No. 32 at 10.) In support of this argument, Plaintiff cites *Rickman v. Premera Blue Cross*, 358 P.3d 1153 (Wash. 2015).

In *Rickman*, the employee alleged "she was terminated in retaliation for raising concerns about potential violations of the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA)" and its state counterpart. 358 P.3d at 1155. The trial court "found the *clarity* element of the tort of wrongful discharge was readily established based on HIPAA" and its state counterpart. *Id*. at 1157. The clarity element was not at issue on appeal. (*Id*.) Thus, the alleged public policy of "waste of state resources" finds no support in *Rickman*. Moreover, Plaintiff fails to cite a statute or regulation prohibiting a private contractor from using its discretion to determine when it is, or is not, appropriate for an employee to fly commercially to a location. It, therefore, cannot be concluded that raising concerns about Defendants' decision to accept Gilmore's explanation without further discipline was related to a recognized public policy.

Accordingly, Plaintiff has failed to establish the existence of a clear public policy against "waste of state resources."

2. <u>The Jeopardy Element</u>

Under the second part of the Perritt test, Plaintiff must establish that discouraging the conduct in which he engaged would jeopardize the public policy. Plaintiff establishes jeopardy by demonstrating that his or her conduct was either directly related to the public policy or

necessary for effective enforcement.  *Rose v. Anderson Hay & Grain Co*., 358 P.3d 1139, 1146 (Wash. 2015).

Because Plaintiff cannot establish the existence of a clear public policy against "waste of state resources," Plaintiff cannot establish the jeopardy element.  In addition, nothing in Plaintiff's April 2018 complaint against Gilmore raised concerns about the "waste of state resources" as Plaintiff now suggests.  Plaintiff's complaint principally concerned what he perceived to be Gilmore's sub-par performance and questionable moral and ethical standards, as well as his disagreement about how Gilmore was disciplined for the infraction. (Dkt. No. 27-6 at 2–3.)

   3. <u>The Causation Element</u>

Even assuming the existence of the clarity and jeopardy elements, Plaintiff fails to establish the causation element.  Plaintiff must prove the public policy linked conduct in question caused his dismissal.  Causation in a wrongful discharge claim is not an all or nothing proposition.  *Rickman*, 358 P.3d at 1160.  The employee "need not attempt to prove the employer's sole motivation was retaliation."  *Wilmot v. Kaiser Alum. & Chem. Corp*., 821 P.2d 18, 29 (Wash. 1981).  The employee must produce evidence that the actions in furtherance of public policy were "*a* cause of the firing, and [the employee] may do so by circumstantial evidence." *Id*. (emphasis in original).  This test asks whether the employee's conduct in furthering a public policy was a "substantial" factor motivating the employer to discharge the employee. *Id*. at 30.

Plaintiff cannot establish a causal connection, even a circumstantial one, between his complaint about Gilmore and CACI's decision to fire him.  Plaintiff argues the timing of his discharge, more than one year after he filed his complaint against Gilmore, is evidence

Defendants retaliated against him for complaining about Gilmore's alleged "waste of state resources." (Dkt. No. 1-1 at 13–14.) Cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–274 (2001); *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1068 (9th Cir. 2002) (Gap of ten months between the protected action and the termination did not give rise to an inference of causation.)

Here, a gap of more than a year between Plaintiff's complaint against Gilmore and his termination does not give rise to an inference of retaliation. Nor would such an inference take into account other events that occurred during that year—namely the complaints made against Plaintiff by CACI's African American employees.

Accordingly, Plaintiff cannot establish that his alleged conduct in furthering a "public policy" was a substantial factor in CACI's decision to fire him.

    4. <u>The Absence of Justification Element</u>

Plaintiff also fails to establish the final element of the Perritt test. Here, Defendants offer an overriding justification for Plaintiff's dismissal. "Once a plaintiff presents a prima facia case of wrongful discharge in violation of public policy, the burden of proof shifts to the employer to show the termination was justified by an overriding consideration." *Rickman*, 358 P.3d at 1160. "The employer must produce relevant admissible evidence of another motivation, but need not do so by the preponderance of evidence necessary to sustain the burden of persuasion, because the employer does not have that burden." *Martin*, 425 P.3d at 725–726 (quoting *Wilmot*, 821 P.2d at 20).

Defendants have presented evidence Plaintiff was fired because of comments he allegedly made to African American employees, and the impact those comments had on CACI employees and employees of CACI's main customer, the United States Government. Defendants have produced evidence of the process they used to investigate the complaints lodged against Plaintiff, emails of CACI personnel explaining the decision process the company went through in deciding to terminate Plaintiff, and an email from government employee Marcus Allen expressing his concerns about Plaintiff's alleged comments. In comparison, Plaintiff fails to cite any evidence contradicting that offered by Defendants.

As such, it can only be concluded that Defendants have offered an overriding justification for Plaintiff's dismissal.

## IV.   ORDER

Defendants' motion for summary judgment (Dkt. No. 26) is GRANTED. Plaintiff's claim is DISMISSED with prejudice. Plaintiff's motion to continue the trial date (Dkt. No. 35) is DENIED as moot.

Dated this 26th day of May, 2023.

David G. Estudillo
United States District Judge